UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| FRED JAY SKOLNICK,<br>    *Petitioner,*<br>    *v.*<br>ANDREA WAINER,<br>    *Respondent.* | Civil No. 3:13cv1420 (JBA)<br><br>April 16, 2014 |

**MEMORANDUM OF DECISION AND ORDER**

On August 21, 2013, Petitioner Fred Jay Skolnick filed a Verified Petition [Doc. # 1] pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (the "Convention"), and its domestic implementing legislation, the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq.* ("ICARA"), seeking the return to Singapore of his five minor children, who were taken from Singapore by their mother, Respondent Andrea Wainer and are currently residing in Connecticut.   The parties have now entered into a stipulation approved [Doc. # 86] by the Court, providing for Respondent's voluntary return of the children to Singapore without any admissions of liability and for determination of custody by a court in Singapore (the "Return Stipulation").   The parties agreed that the hearing before this Court was limited to "the determination of such conditions and/or undertakings, if any, that the Court may impose to ensure the well-being of the Five Children pending the determination of custody in the Singapore Action."[1]   (Return Stipulation ¶ 4.)   The Court held a three-day evidentiary hearing on

---

[1] Both parties have outlined their proposed undertakings in their pre- and post-hearing memoranda, which are referenced in this Order.   Additionally, Respondent has addressed undertakings in a Motion [Doc. # 69] for Relief Under 42 U.S.C. § 11604 and a Revised Motion [Doc. # 112] for Relief.   Respondent's first Motion for Relief is denied as

this Petition pursuant to the Return Stipulation and the following constitutes the Court's findings and order on the parties' undertakings to be performed in connection with the children's return to Singapore.

## I.    Facts

### A.    Background

Petitioner and Respondent are both American citizens, who were married in the United States in November 1999, but have never lived here together as a married couple. (Am. Pet. [Doc. # 34] ¶ 5.)   They have five minor children ranging in ages from four to thirteen years old, all of whom were born in either Hong Kong or Tokyo:

- Z.S., born in Hong Kong and currently 13 years old;

- M.S., born in Tokyo, Japan and currently 10 years old;

- A.S., born in Tokyo and currently 8 years old;

- E.S., born in Hong Kong and currently 6 years old; and

- R.S., born in Tokyo and currently 4 years old.

Mr. Skolnick currently resides in Singapore and leads the Asia-Pacific office of Westwood Partners, an executive search and advisory firm for financial services companies.   Mr. Skolnick has previously worked in finance and human resources for Goldman Sachs, Lehman Brothers, and Nomura in Hong Kong, Singapore, Tokyo, London, and New York.   Mr. Skolnick received a law degree from Fordham University School of Law and was admitted to the New York bar, but has never practiced law.   Ms. Wainer received a master's degree in social work from New York University and, after

---

moot in light of the Revised Motion.  Her Revised Motion is granted in part and denied in part, as outlined in this Order.

marrying Mr. Skolnick in 1999, moved from New York to Hong Kong and worked part-time as a guidance counselor at St. John's Cathedral.

When the couple moved to Tokyo for Mr. Skolnick's work, Ms. Wainer worked only minimally and when they later moved to London, Ms. Wainer stopped working outside the home and focused on raising the children.  During this time, Mr. Skolnick supported the family and paid all of their expenses, including the children's schooling.  Ms. Wainer testified that in both Tokyo and London, Mr. Skolnick worked long hours and traveled frequently.  He would come home for dinner one night per week, and, although he was generally at home on the weekends, he spent most of his time alone in a room away from the family, spending only Saturday mornings with the children.

In June 2011, while the parties were living in London, Ms. Wainer filed for divorce in the Principal Registry of the Family Division, London, England (the "London Action" and the "London Court"), because Mr. Skolnick was physically abusive to her and the children, and spent very little time with the family.  Ms. Wainer testified that Mr. Skolnick started using physical chastisement against the children when Z.S. was seventeen months old and would regularly hit, spank, punch, and throw items at the children.  Mr. Skolnick described himself as the primary disciplinarian and acknowledged that he had used corporal punishment, which he viewed as a necessary tool as they had more children.

Due to Mr. Skolnick's continued physical chastisement of the children, on June 8, 2011, Ms. Wainer received an ex parte "Non-Molestation Order" in London.  Mr. Skolnick told a social worker who was conducting an assessment of the children that he believed physical chastisement was sometimes necessary but had gained a better understanding that the laws related to physical chastisement in the United Kingdom

varied from the Asian countries where the children were raised.  (Resp't's Ex. C at 10.)
The social worker observed that the children had a "secure attachment with their mother"
and "appear very close with one another, and with their mother" and "spoke lovingly of
both of their parents."  (*Id.* at 8, 10.)  Although the social worker did not observe the
children with Mr. Skolnick, they spoke about him "in a positive way" but "said they did
not like being hit or "flicked"[2] by their father as it hurts them and makes them sad."  (*Id.*
at 8)  The evaluation concluded that the children "are not at risk of significant harm."[3]
(*Id.* at 11.)

Despite the pending divorce, the family continued to live together and in
December 2011, while Ms. Wainer was in Singapore for vacation, she sustained a serious
injury to her back and risked paralysis if she attempted to travel back to London for
treatment.  Although Ms. Wainer remained in Singapore for medical treatment, she
denied that she had decided to live in Singapore with the children and Mr. Skolnick at
this point, which she said was evidenced by the fact that the family still had a lease and the
children were still enrolled in school in London.  She acknowledged, however, that she
was considering Singapore as a potential place to live along with Connecticut,
Massachusetts, and New York—all places where Mr. Skolnick could work and live near
her and the children.

---

[2] Mr. Skolnick used "flicking" as a method of striking the children on neck by
snapping his forefinger across his thumb.  He stopped using this method of physical
punishment at Ms. Wainer's request after the family left Tokyo.

[3] On June 17, 2011, the London Non-Molestation Order was discharged after
Petitioner filed a written undertaking with the court, promising not to use violence
against Ms. Wainer or the children.  (Jt. Hr'g Mem. [Doc. # 117] at 18.)

While Ms. Wainer was recovering from her injury, she asked Mr. Skolnick to bring the children to her in Singapore and he eventually did in March or April of 2012. At the time, Ms. Wainer did not believe that Mr. Skolnick was working, as he had lost his job in London, but Mr. Skolnick had shut her out of access to the couple's financial information.  Ms. Wainer sought and obtained three ex parte protective orders from the Singaporean Court restraining Mr. Skolnick from committing family violence on December 22, 2012, May 7, 2013, and May 17, 2013, and on May 31, 2013, she took the children to the United States, maintaining that she feared for their safety.  (Jt. Hr'g Mem. at 18.)

### B.      Events in United States

Ms. Wainer spent the summer of 2013 in Maine and Connecticut with the children.  Petitioner initially did not know the children's whereabouts and hired a private investigator to locate them.  On August 23, 2013, after Mr. Skolnick learned that they were living in Greenwich, Connecticut, he drove with his brother to the house where they were living.  Mr. Skolnick anticipated that Ms. Wainer would not allow him to see the children, but he was about to return to Asia and wanted them to know that their father missed them, and his brother needed to serve Ms. Wainer with the Hague Convention Petition, which had been filed two days prior.  After Mr. Skolnick rang the doorbell, a young woman answered the door, and when Mr. Skolnick explained that he was there to see his children and picked up R.S. who was calling out to him, she started screaming "as if [Mr. Skolnick] was the Taliban and [he had] just shot everybody in the house," and yelled for the children to go upstairs and call the police.  (Hr'g Tr. Vol. I at 40.)

Mr. Skolnick was shocked by her response and "instinct took over" and he returned to the car with R.S., where his brother waited out of view of the house's entrance

with the engine running.  When Ms. Wainer returned one minute later, having received a frantic call from her babysitter, Mr. Skolnick and R.S. were gone.

After departing the Greenwich home, Mr. Skolnick drove to Brooklyn, where the Petition was filed because Mr. Skolnick believed the court had jurisdiction over R.S. there. Petitioner's attorney contacted Magistrate Judge Go of the Eastern District of New York, who arranged for R.S. to be returned to Ms. Wainer two days later.  During those two days, Mr. Skolnick and R.S. stayed at a friend's house on Long Island, visited with Mr. Skolnick's mother, and took trips to the Central Park Zoo and Museum of Natural History.  R.S. later told Mr. Skolnick that she had a great time and wanted to return for another visit.

On the same day that Mr. Skolnick took R.S., Ms. Wainer obtained an ex parte protective order from the Superior Court of Stamford, requiring Mr. Skolnick to stay away from Ms. Wainer and the five children.  The following day, a Greenwich Police Department detective advised Petitioner through counsel of the protective order, but his attorney responded that Petitioner would not return R.S. to Connecticut because he expected the Eastern District court to vacate that order.  Based on Petitioner's refusal to comply, on August 24, 2013, the Superior Court issued an arrest warrant.  Mr. Skolnick acknowledged that at some point prior to returning R.S., he became aware of the protective order and arrest warrant, but he believed that his attorneys and Magistrate Judge Go would resolve the issue and he returned to Singapore without addressing it.  He returned to Connecticut on November 15, 2013 to turn himself into the Greenwich Police Department and was arrested upon his arrival at Bradley Airport.  The criminal charges against him were thereafter nolled.

Prior to Mr. Skolnick's return, on October 17, 2013, the parties entered into a stipulation (the "Superior Court Stipulation" [Pet'r's Ex. 3]) providing that the protective order would remain in effect until January 8, 2014, but modified it to state that "the parties shall have joint legal custody of each of the Minor Children with primary physical residence with" Ms. Wainer and the children remaining enrolled in Greenwich public schools.   (Superior Court Stipulation ¶¶ 8(b)–(c).)   "After an initial period of reunification" with the children, Mr. Skolnick was to have "liberal and reasonable access to the Minor Children by phone, fax, e-mail, text message and/or Skype, as well as visitation as to be agreed upon by the parties."  (*Id.* ¶ 8(d).)

### C.    Medical Records

After the incident with R.S., Ms. Wainer sought counseling for all the children at the Child Guidance Center of Central Connecticut.  Dr. Larry Rosenberg, the director, provided a testimonial overview of the children's treatment records.  On August 30, 2013, all of the children were struggling with traumatic effects from witnessing Mr. Skolnick take R.S.  (*See* Resp't's Exs. I–P.)  R.S. was suffering from nightmares, dysregulation, and the inability to tolerate frustration since her father returned her and was distractible, unfocused, hostile, and exhibited impaired impulse control and judgment by trying to escape from her home and engaging in unsafe activities.  (Resp't's Ex. O at 515–21.)

M.S. was fearful that a similar incident would recur and it impacted his sense of safety.  He was irritable and oppositional in the days following the abduction and the treating doctor concluded that he was in the peri-traumatic phase, the period that precedes post-traumatic stress disorder.  (*See* Resp't's Ex. L at 291–92.)  On November 24, 2013, a social worker reported that M.S. was angry, would hit his head against a wall, and

had thoughts of killing himself with a knife so that he wouldn't have to feel bad any longer.  (*See id.* at 306–19.)

Z.S., the oldest child, reportedly had the greatest insight into the incident and was still struggling with fear of her father, difficulty eating and sleeping, and embarrassment because her peers might learn what was happening with her family.  (Resp't's Ex. K at 265–73.)  A.S. reported that she was struggling with feelings of guilt, because she had tried to help R.S. up the stairs but was unable to stop Mr. Skolnick from taking her.  (*See* Resp't's Ex. M at 341.)

Lilian Ankrah, a creative arts therapist at the YWCA of Greenwich, described her work with the children since June 2013.  She observed that after the August incident, the children, especially M.S., were concerned about their safety, and Z.S. was embarrassed because everyone in town was aware of what was happening.  In general, the children told her that they wanted to have visitation with their father but expressed anxiety about unplanned and unstructured visits.  Ms. Ankrah testified that the children were very connected and securely attached to their mother and felt safe in their current environment.  The children told her that they want to stay in Connecticut rather than return to Singapore, and Ms. Ankrah believed that a longer timeframe for their return would help them prepare for the transition and develop coping skills.  She believed that the end of the school year in Greenwich would be the best time for their return, as it is natural point of transition and would provide sufficient time for counselling.

## D.    Care for E.S.

One of the primary issues in contention between the parties is E.S.'s special treatment needs.  Ms. Wainer testified that by the time E.S. was 13-months old, she noticed that he was difficult to connect with and was not meeting developmental

milestones.  He would not interact with other children at school and would grunt rather than speak.  He acted violently towards his siblings, hitting, kicking, and jumping on them, pulling their hair, attempting to hold R.S.'s head under water while she was bathing, poking R.S. in the face, and trying to push her out a window.  Petitioner generally refused to acknowledge that E.S. had problems and was not agreeable to exploring treatment options, including a psychological assessment, which was recommended by E.S.'s school and doctors.  Shortly before Ms. Wainer injured her back, E.S. received a M.R.I. in London, but Ms. Wainer was not able to follow up on treatment options due to her injury.  Ms. Wainer wants to pursue further treatment for E.S. while he is the United States, but stated she does not have the financial resources to do so because despite maintenance payments Petitioner has made to her pursuant to an order by the London Court, he has cut off her financial resources and his insurance does not cover E.S. while he lives outside of Singapore.  In particular, Ms. Wainer wants E.S. to receive a neuropsychological examination.  (*See* Resp't's Revised Mot. for Relief at 9.)

Dr. Rosenberg testified that E.S. was diagnosed with pervasive development disorder, marked by difficulties with interpersonal relationships, reasoning, and judgment; the inability to read social cues; and difficulty with speech and social interactions.  E.S. was prescribed a generic version of Ritalin for attention deficit hyperactivity disorder and Abilify, an antipsychotic drug used to treat bipolar disorder, schizophrenia, and irritability associated with autistic disorder.  (Resp't's Ex. N at 353–68; Resp't's Ex. P.)  Ms. Wainer reported that Abilify was very effective in treating E.S.'s violent outbursts.

Dr. Norman R. Klein, a clinical and forensic psychologist, testified that he met with E.S. for approximately an hour and a half for the limited purpose of rendering an

opinion for Respondent on the sufficiency of E.S.'s treatment to date.   Dr. Klein concluded that there were glaring deficiencies in the treatment that could be provided by his speech and occupational therapists, and that E.S. needed a neuropsychological assessment, which is a series of tests conducted over two to three days by psychologists to examine different areas of the brain.   Dr. Klein opined that these tests were urgent and should be done as soon as possible, because children become more difficult to treat as they age and their behavior ossifies over time, but there was no specific timeframe that he believed was required.   The tests cost $1,500 to $2,000 a day and Dr. Klein did not know if they could be performed in Singapore but stated that the procedures available in the United States are state-of-the-art.

###### E.      Status of Other Judicial Proceedings

On July 10, 2013, Petitioner filed an action in Singapore, seeking the return of the children to Singapore.   *See Fred Skolnick v. Andrea Beth Wainer, Case No OSF 303120131Q, High Court Republic of Singapore* (the "Singaporean Action" and the "Singaporean Court").   Both parties are represented by counsel and have consented to the Singaporean Court's jurisdiction on all custody-related matters.   A full-day hearing on the parties' respective custody applications is scheduled for April 24, 2014.   (Jt. Hr'g Mem. ¶¶ 9–10.)

The London divorce action, which does not address custody issues, is still pending, and both parties have consented to the jurisdiction of that court for the divorce proceedings.   On January 20, 2014, the London court entered financial orders for "global periodic payments" for maintenance to Ms. Wainer in the lump sum of £78,000 on February 3, 2014, plus £13,000 per month through May 13, 2014, when another hearing will be held, and £56,000 to her London counsel.   (Pet'r's Ex. 2.)   At an exchange rate of

1.6 U.S. dollars to the pound, Mr. Skolnick will have paid a total of US$208,000 to Ms. Wainer by May 2014.  (Pet'r's Pre-Hr'g Mem. [Doc. # 116] at 5–6.)

## II.    Discussion

### A.    Hague Convention

"The Hague Convention . . . was designed 'to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access.'" *Ozaltin v. Ozaltin*, 708 F.3d 355, 358–59 (2d Cir. 2013) (quoting Hague Convention, Preamble). "The Convention's drafters were particularly concerned by the practice in which a family member would remove a child to jurisdictions more favorable to his or her custody claims in order to obtain a right of custody from the authorities of the country to which the child had been taken." *Id.* at 359 (quoting *Mota v. Castillo,* 692 F.3d 108, 112 (2d Cir. 2012)).   "To avert this type of forum shopping, the Convention provides for 'the prompt return of children wrongfully removed to or retained in any Contracting State.'" *Id.* (quoting Hague Convention, art. 1).  "And in deference to the authority of foreign legal systems, the Convention focuses solely on 'whether a child should be returned to her country of habitual residence for custody proceedings,' not on resolving 'any underlying custody dispute.'" *Id.* (quoting *Mota,* 692 F.3d at 112).   "If a petitioner prevails in a return action brought under § 11603(b), the court ordinarily must 'order the return of the child forthwith.'" [4]  *Id.* at 360 (quoting Hague Convention, art. 12).

---

[4] The United States has ratified the Convention and implemented its terms through ICARA.  *See* 42 U.S.C. § 11601 *et seq.*  Singapore acceded to the treaty in May 2012.  *See Souratgar v. Fair*, No. 12-CIV-7797 (PKC), 2012 WL 6700214, at *4 (S.D.N.Y. Dec. 26, 2012).

Since the parties have agreed to a return of the children without adjudication of the Petition, further discussion of the elements of a Hague Convention claim or the exceptions applicable to such claims is not necessary except to note that the exceptions are narrow and "do not authorize a court to exceed its Hague Convention function by making determinations, such as who is the better parent, that remain within the purview of the court with plenary jurisdiction over the question of custody." *Blondin v. Dubois*, 189 F.3d 240, 246 (2d Cir. 1999) ("*Blondin I*"). "Were a court to give an overly broad construction to its authority to grant exceptions under the Convention, it would frustrate a paramount purpose of that international agreement—namely, to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." *Id.* (internal quotation marks omitted).

   **B.      Undertakings**

   "Although the Hague Convention does not use the term 'undertaking,'[5] in cases under the Convention courts use the term 'undertaking' to refer to a promise by the petitioning parent to alleviate specific dangers that might otherwise justify denial of the return petition" under the "grave risk" exception.[6]  *Blondin v. Dubois*, 238 F.3d 153, 160 n.8 (2d Cir. 2001) ("*Blondin II*").

   The Hague Convention's Reporter has explained "that the 'whole structure of the Convention' depend[s] on the institutions of the abducted-to state generally deferring to the forum of the child's home state."  *Blondin I*, 189 F.3d at 248 (quoting Elisa Perez-Vera, *Explanatory Report: Hague Conference on Private International Law*, in 3 Acts and Documents of the Fourteenth Session 426 (1980)).  Accordingly, the Second Circuit has explained that "it is important that a court considering an exception under Article 13(b) take into account any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with a child's repatriation," while allowing such a repatriation to occur.  *Id.*

   As the First Circuit has expounded:

   A potential grave risk of harm can, at times, be mitigated sufficiently by the acceptance of undertakings and sufficient guarantees of performance of those undertakings.  Necessarily, the "grave risk" exception considers, inter alia, where and how a child is to be returned.  The undertakings approach allows courts to conduct an evaluation of the placement options

---

   [5] The concept of "undertakings" is a judicial construct, developed in the context of British family law.  *See Danaipour v. McLarey*, 286 F.3d 1, 21 (1st Cir. 2002).

   [6] Under this exception, a child will not be returned if there is a "grave risk" that repatriation would "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Hague Convention, art. 13(b).

and legal safeguards in the country of habitual residence to preserve the child's safety while the courts of that country have the opportunity to determine custody of the children within the physical boundaries of their jurisdiction.   Given the strong presumption that a child should be returned, many courts, both here and in other countries, have determined that the reception of undertakings best allows for the achievement of the goals set out in the Convention while, at the same time, protecting children from exposure to grave risk of harm.

*Walsh v. Walsh*, 221 F.3d 204, 219 (1st Cir. 2000) (footnote omitted).

"Typical undertakings concern support, housing and the child's care pending resolution of the custody contest." *Blondin II*, 238 F.3d at 160 n.8 (quoting Carol S. Bruch, *The Central Authority's Role Under the Hague Child Abduction Convention: A Friend in Deed,* 28 Fam. L.Q. 35, 52 n. 41 (1994)).   The Department of State has opined that "undertakings should be limited in scope and further the Convention's goal of ensuring the prompt return of the child to the jurisdiction of habitual residence, so that the jurisdiction can resolve the custody dispute.   Undertakings that do more than this would appear questionable under the Convention, particularly when they address in great detail issues of custody, visitation, and maintenance." *Danaipour*, 286 F.3d at 22 (quoting Letter from Catherine W. Brown, Assistant Legal Adviser for Consular Affairs, U.S. Dep't of State, to Michael Nicholls, Lord Chancellor's Dep't, Child Abduction Unit, United Kingdom (Aug. 10, 1995)).   The Second Circuit "give[s] great weight to the State Department's interpretation of the Convention," as it is responsible for its enforcement. *Blondin II*, 238 F.3d at 162 n. 10.

International comity is also an important concern in imposing undertakings.   The Department of State has explained that:

Undertakings would appear most consistent with the Convention when designed primarily to restore the status quo ante, or when they impose reciprocal obligations on both the left-behind and the taking parent. . . .

14

> The approach taken by [some] courts, whereby undertakings are reasonably tailored to expedite the return of the child, impose reciprocal obligations on both parents, and explicitly terminate upon action by the court of appropriate jurisdiction, seems entirely appropriate.

*Danaipour*, 286 F.3d at 22 (quoting State Department Legal Memorandum attached to letter to British government) (alterations in original).

According to the U.S. Department of State appropriate undertakings include: an agreement that the abducting parent return to the country of habitual residence with the child; assignment of costs for the return flight; and interim custody until a court in the country of habitual residence can arrive at a decision.[7]   *Id.*   As an alternative to undertakings, the State Department has suggested "safe harbor" orders, entered by a court in the country of habitual residence at the behest of the left-behind parent, prior to the entry of the return order.   *Id.*   Such an approach avoids "the unseemliness of a U.S. court issuing orders for a foreign court to enforce, and the foreign court's possible noncompliance."   *Id.*

Consistent with this approach, even in instances where a court has determined that a respondent has not met the "exceedingly high standard" of establishing the "grave

---

[7] More recently, the Department of State has warned of "a disturbing trend," among countries outside the United States of imposing "onerous pre-conditions on return that have delayed return of the children, sometimes for many months, while the applicant parent attempts to fulfill the obligations imposed."  The Department of State cautioned that courts imposing undertakings "walk a fine line," as "[c]arefully crafted undertakings can enhance Convention practice, but excessive undertakings may quickly cross the line and work against Convention purposes" by delaying the child's return. Kathleen Ruckman, Deputy Director, Office of Children's Issues, Dep't of State, *Undertakings as Convention Practice: The U.S. Perspective* (2005), *available at* http://www.state.gov/s/l/2005/87187.htm.  Broad undertakings can also undermine the Convention by allowing "abducting parents to gain significant advantages from the abduction."  *Danaipour*, 286 F.3d at 23 (internal quotation marks omitted).

risk" affirmative defense, it can nevertheless impose interim undertakings pending final adjudication by courts in the country of habitual residence to address "a very real potential for harm upon a child's return." *Krefter v. Wills*, 623 F. Supp. 2d 125, 137 (D. Mass. 2009). In *Krefter*, the court ordered the return of a child to Germany from the United States, and although the mother could not establish that return would result in a "grave risk" of harm to the child, the court determined that she had "little prospect of supporting herself and [the child]" in Germany and that unless the father "undertakes to provide for the financial security of both [the mother and their child] during the course of custody proceedings in Germany," there was "a great risk of harm" to the child resulting from a "prolonged separation" from his mother. *Id.* The court ordered that before the child could be returned to Germany, his father had to pay for (1) airline tickets for both the mother and child, (2) three months of child support at €810 per month, and (3) provide housing for the mother and child in Germany pending a resolution of the custody dispute by a German court. *Id.* at 138.

Likewise, in *Kufner v. Kufner*, 480 F. Supp. 2d 491, 514 (D.R.I. 2007), the court rejected the respondent's "grave risk" affirmative defense based on sexual abuse allegations, but determined that appropriate undertakings were required to ensure that the respondent had continued access to her children in Germany "due to the attachment the children have developed with their mother." The court ordered that the petitioner permit visitation upon return "[u]ntil the appropriate German court makes specific determinations regarding custody and access and visitation rights." *Id.* at 516. The court also ordered that the petitioner take action to address certain medical needs for one of the children in Germany. *Id.*; *see also Rial v. Rijo*, No. 1:10cv01578 (RJH), 2010 WL 1643995, at *3 (S.D.N.Y. Apr. 23, 2010) ("[P]etitioner has agreed to a number of undertakings that

the Court believes will ensure D.R.'s safe and speedy return to Spain.   Specifically, petitioner has agreed to rent an apartment in the center of town for six months, where both respondent and D.R. can feel secure upon their return to Spain. . . .   In addition, petitioner shall pay child support in the amount of 500 euros/month for three months or until a Spanish court enters an order regarding support, whichever occurs earliest.   The parties will make arrangements for D.R. to spend ample time with her father once in Spain, or, failing agreement, as the Spanish court may order.").

Mindful of the Hague Convention mandate to ensure prompt and safe return of removed children, respecting international comity and leaving custody determinations to the return country's court, but protecting the interests of the children until that court can act, this Court's determination of appropriate undertakings follows.

### 1.   Return Date and Schooling Arrangements

Ms. Wainer proposes that the five children return to Singapore on June 30, 2014, ten days after the end of their school year in Greenwich (Resp't's Revised Mot. at 6), contending that it is a natural transition point and would give them sufficient time to prepare for the significant change (Resp't's Post-Hr'g Mem. [Doc. # 144] at 11–12). Before the children leave the United States, Ms. Wainer wants Mr. Skolnick to provide written verification that he has secured and paid for enrollment of each of the children at the Stamford American School, where the oldest three children—Z.S., M.S., and A.S.— were previously matriculated.  (*Id.* at 12.)

Mr. Skolnick confirms that all five children have now been accepted at schools in Singapore:  Z.S., M.S., and A.S at the Stamford American School, and E.S. and R.S. at St. Gerard's School (Pet'r's Post-Hr'g Reply [Doc. # 147] at 2), and he has agreed to "be

responsible for the initial funding for the current school term"[8] (Pet'r's Pre-Hr'g Mem. [Doc. # 116] at 9).  Mr. Skolnick contends that the Greenwich school's spring break is the "ideal opportunity" for the children's return.  (Pet'r's Post-Hr'g Reply at 2.)  However, the parties' final briefing only concluded March 27, 2014, the last term of the Stamford American School commenced on April 2, 2014 (Resp't's Revised Mot. at 6), and returning the children under Mr. Skolnick's schedule gives the children an incomplete term in both Greenwich and Singapore, and little time to adjust to the transition.

Although "both the Hague Convention and ICARA stress the importance of the prompt return of children wrongfully removed or retained," the Supreme Court is "sympathetic to the concern that shuttling children back and forth between parents and across international borders may be detrimental to those children" and has directed courts to "achieve the ends of the Convention and ICARA—and protect the well-being of the affected children—through the familiar judicial tools of expediting proceedings and granting stays where appropriate."  *Chafin v. Chafin*, 133 S. Ct. 1017, 1026–27 (2013).

Since the children have only two months left in their school year in Greenwich, the Court concludes that a relatively short additional delay is warranted to smooth their transition.[9]  As Ms. Ankrah testified, the children have adjusted to life in Greenwich over

---

[8] Mr. Skolnick intends to use funds from his HSBC U.S. dollar-denominated account located in Jersey and requests that to the "extent any relief from the London Court is required to enable him to access that account, Ms. Wainer must agree to cooperate in obtaining such relief on an expedited basis."  (Pet'r's Pre-Hr'g Mem. at 9.) The Court leaves this issue to the London Court.

[9] The delay in the resolution of this Petition has been caused by Petitioner's initial inability to locate the children in the United States, the transfer of this case from the Eastern District of New York to the District of Connecticut, the parties' joint requests for adjournments to engage in settlement negotiations, and their requests for an extended post-hearing briefing schedule.  This case also may be atypical in that under the Return

the course of the school year, have formed bonds with their classmates and have become engaged in a range of extra-curricular activities.  Allowing the children to finish the school year and providing them with sufficient notice of their departure date will allow Ms. Ankrah and other professionals to better prepare them for the significant upcoming transition and reduce the ill effects of the disruptions associated with the move. Accordingly, the children shall depart the United States for Singapore no later than June 24, 2014.

      2.    *Financial Matters*

Ms. Wainer requests a number of undertakings to provide for her financial wellbeing in Singapore, contending that she has no other means to support herself and the children there.  While the Return Stipulation makes adjudication of wrongful removal unnecessary, in fashioning such undertakings the Court is cognizant that extensive financial undertakings have the potential to undermine the Convention by rewarding a removing parent or delaying the children's repatriation.  However, financial undertakings that facilitate their return and that are designed to ensure their wellbeing in the interim are consistent with the Convention's aims.  *See Danaipour*, 286 F.3d at 23.

First, Ms. Wainer's request that Mr. Skolnick provide four month's advance payment of court-ordered child support at the rate of £13,000 per month (Resp't's Post-Hr'g Mem. at 13–14), essentially asks this Court to extend beyond May 2014 an order issued by the London Court which has jurisdiction over divorce proceedings and maintenance payments, which would be inappropriate.  Under principals of international comity, Ms. Wainer should direct her request to the London Court.

---

Stipulation, Ms. Wainer has not conceded that the children's habitual residence is Singapore or that they have been wrongfully removed.  (*See* Return Stipulation ¶ 3.)

Second, Ms. Wainer requests that Mr. Skolnick provide her with SG$34,000 (approximately US$27,100) for her legal expenses in the Singaporean Action, which her counsel has requested in advance of the April 24, 2014 hearing.  (Resp't's Post-Hr'g Mem. at 15.)  Such an undertaking is rejected as inconsistent with the Convention and the State Department's guidance, as it is not designed to restore the status quo ante, is not needed to facilitate the return of the children or tailored to protect their wellbeing, and could invade the province of both the London and Singaporean Courts.  *See Abbott v. Abbott*, 560 U.S. 1, 9 (2010) ("A return remedy does not alter the pre-abduction allocation of custody rights but leaves custodial decisions to the courts of the country of habitual residence.").

Third, Ms. Wainer asks that Mr. Skolnick be required to pay return airfare for the children and herself, pay all costs of storage and moving for their belongings left behind in Singapore to ensure that she and the children will have access to their personal belongings upon their return, and an additional US$10,000 to move other personal property from the United States to Singapore.  (Resp't's Post-Hr'g Mem. at 15.)  Mr. Skolnick has agreed "to pay for the children's airfare and have them travel back to Singapore with him."  (Pet'r's Opp'n to Mot. for Interim Relief [Doc. # 115] at 8.)  He testified that he wishes to accompany the children on their return flight, because there are no direct flights from the United States to Singapore and he has already been a victim of international child abduction.  However, given that both parties express concern about conserving marital assets, it will be both more efficient and likely less expensive to have Ms. Wainer accompany the children back to Singapore, and this approach will ease the children's transition, since they have spent most of the past year with Ms. Wainer.

To address potential concerns regarding the children's further removal, Mr. Skolnick himself will book the most direct and speedy travel possible to Singapore and with layovers only in countries that are signatories to the Hague Convention.[10]  The children's passports, which are currently in the possession of Ms. Wainer's counsel, will be returned to Ms. Wainer two days before the children's departure to Singapore unless the Court orders otherwise.  Upon return to Singapore, Ms. Wainer's Singaporean counsel, Poonam Lachman Mirchandani, shall hold the children's passports until further order of the Singaporean Court.

Although Mr. Skolnick is relieved of the expense of purchasing himself a round-trip ticket to the United States, the Court directs that in addition to booking tickets for the five children, he must also purchase Ms. Wainer's one-way ticket, as her presence is vital to the children's wellbeing in transit.  Mr. Skolnick has also offered to pay US$5,000 total for storage expenses for property left in Singapore and for moving property within Singapore and from the United States.  (*Id.*)  This proposed amount is inadequate, however, given that Mr. Skolnick's first payment for Singaporean storage costs alone was for SG$4,000 (approximately US$3,200) (Skolnick Aff. [Doc. # 148] ¶ 4), meaning that a US$5,000 total payment would leave insufficient funds to cover additional storage expenses and moving costs.  Consistent with the Convention's goal of restoring the status quo ante and ensuring a smooth transition for the children, Mr. Skolnick is directed to finalize payment of storage and moving fees required to move the property stored in Singapore to the location of the children's primary residence in advance of their return in

---

[10]  *See* U.S. Dep't of State, *U.S. Hague Convention Treaty Partners*, http://travel.state.gov/content/childabduction/english/country/hague-party-countries.html.

June.   In addition, Mr. Skolnick will pay up to US$5,000 for moving costs from the United States to Singapore for the belongings of the children and Ms. Wainer.[11]

---

[11] Under 42 U.S.C. § 11607(b)(3) "[a]ny court ordering the return of a child . . . shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, . . . and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate."  Given Respondent's limited financial resources, the Court concludes that such an order would be clearly inappropriate.  *See e.g., Berendsen v. Nichols*, 938 F. Supp. 737, 739 (D. Kan. 1996) ("[T]he court believes a fee award which unduly limited respondent's ability to support his children would be 'clearly inappropriate' . . . . in light of respondent's financial status and his support of his children.").  For the same reason and because, as discussed above, an undertaking providing for the payment of Respondent's legal expenses is not consistent with the aims of the Convention, Respondent's motion [Doc. # 91] for an order requiring that Petitioner pay her $250,000 for legal fees associated with opposing the Hague Convention Petition is denied.

3.    *Living Arrangements in Singapore*

Ms. Wainer requests that the children reside with her in Singapore pending the final disposition of custody proceedings because Ms. Wainer has always been the primary caretaker and Petitioner has a history of physical chastisement, neglect and a heavy work and travel schedule.  (Resp't's Post-Hr'g Mem. at 12.)  Mr. Skolnick does not believe that Ms. Wainer should have primary physical custody of the children, because he had always lived with them before their removal to the United States.  He envisions either that he and Ms. Wainer would maintain parallel residences and the children would spend alternating weeks residing with each of them or that they would use the "bird's nest" approach, which he viewed as most efficient, in which the children would continuously reside in one residence and Mr. Skolnick and Ms. Wainer would maintain their own smaller residences and spend alternating weeks in the primary residence with the children.

Given the evidence in the record regarding Mr. Skolnick's use of physical chastisement and the heavy demands of his work and travel schedule, the Court concludes that until the Singaporean Court can address custody issues, the children should primarily reside with Ms. Wainer.  The record shows that Ms. Wainer always has had the primary role of caring for the children, and the London authorities, Ms. Ankrah, and counsellors from the Child Guidance Center have all noted that the children have a firm attachment to their mother.  Additionally, alternating weeks may be disruptive to the children in the short-run and an impediment to their acclimatization.

The last agreement that Mr. Skolnick and Ms. Wainer reached regarding residence and visitation was the Connecticut Superior Court Stipulation under which the children maintained primary physical residence with Ms. Wainer and Mr. Skolnick was afforded liberal access by phone and electronic means and physical visitation.  (Superior

Court Stipulation ¶¶ 8(b)–(c).)  Consistent with this approach, the Court concludes that until the Singaporean Court issues its orders, the children shall reside with Ms. Wainer, and as under the terms of the Superior Court Stipulation, Mr. Skolnick shall be afforded liberal visitation and access rights.[12]

Both parties represent that they have the ability to seek relief from the Singaporean Court on an expedited basis, and Ms. Wainer has already demonstrated her ability to do so.  Nothing in this order is intended to impede in any way the ability of the Singaporean Court to make provisions for temporary or permanent custody and visitation arrangements, and any provisional undertakings imposed by this Court can be amended by the Singaporean Court at any time.[13]

Ms. Wainer anticipates that because she is not employed in Singapore and has no source of income apart from Petitioner's maintenance payments, it will be difficult for her to secure housing in Singapore.  She wants Petitioner to pay four months of rent at SG$10,000 per month and help her obtain a lease in Singapore, including being a co-

---

[12] The parties dispute whether Singaporean courts recognize the concept of shared care and control or whether the Singaporean Court will ultimately choose to award custody to a single parent with visitation rights awarded to the non-custodial parent. (*Compare* Pet'r's Post-Hr'g Mem. at 2–3, *with* Resp't's Post-Hr'g Reply at 3–6.)  The Court leaves it to the Singaporean Court to make this determination and amend or supersede this interim Order as appropriate under Singaporean law and the circumstances it finds exist.

[13] Although Petitioner contends that the Singaporean court is unlikely to address temporary custody issues until the children return to Singapore, to the extent that the parties can obtain orders from the Singaporean Court before the children's arrival in Singapore, the Court encourages them to do so.  This approach would be consistent with the State Department's recommended "safe harbor" strategy in which the jurisdiction that will ultimately determine custody issues assumes this responsibility at the earliest possible moment, avoiding the potential problems associated with this Court issuing an order that must be at least partially performed in a foreign jurisdiction.

signer or guarantor.  Mr. Skolnick does not object to serving as a co-signer or guarantor, but wants the ability to seek to offset any rent payments he makes on behalf of Ms. Wainer from maintenance or child support payments ordered by the London Court. Because Ms. Wainer's presence in Singapore is critical to the children's wellbeing, Mr. Skolnick shall secure housing for her and the children to be ready for their immediate occupancy, with their belongings from storage, upon their return to Singapore.[14]  Mr. Skolnick shall pay up to SG$6,000 per month for this housing, serving as a guarantor and/or co-signor on a lease as necessary, until further order of the Singaporean Court. [15] Issues of offset are preserved and may be taken up in the London Court proceedings.

Mr. Skolnick must provide written confirmation to the Court that the necessary arrangements have been made and that a residence is ready for immediate occupancy upon the children's return to Singapore.

---

[14] Mr. Skolnick shall not enter Ms. Wainer's residence without her consent or court authorization.

[15] The Court concludes that SG$6,000 a month for housing is sufficient given that Mr. Skolnick has secured a four-bedroom, 2100-square-foot duplex in a gated complex with a pool and a playground, less than a ten-minute walk from the Stamford International School, for a monthly rent of SG$5,450 or approximately US$4,300. (Pet'r's Post-Trial Reply at 3.)  The Court leaves it to Petitioner to decide whether this residence will be provided to Ms. Wainer and the children or if he will secure another suitable residence for them.

4.      *Visas*

The residence visas for Ms. Wainer, M.S., R.S., and E.S. expire in May 2014. Respondent requests that Petitioner be ordered to apply for a "dependence pass" for them and provide written confirmation that he has done so prior to their return.  In the event that any of them cannot obtain a long-term visa, Ms. Wainer seeks to be able to return to the United States with all five children.  (Resp't's Post-Hr'g Mem. at 15.)  Mr. Skolnick objects to this undertaking, because it could result in the children not being returned to him based on factors partially outside of his control, i.e., approval of Ms. Wainer's visa by the Singaporean government.  Given that the wellbeing of the children depends upon Ms. Wainer's presence in Singapore, Mr. Skolnick shall provide needed assistance in Ms. Wainer's visa processing, since if Ms. Wainer or any of the children is unable to secure a visa, it may be necessary for the Court to postpone the children's return date.[16]  Ms. Wainer is likewise ordered to fully cooperate with this effort and to pursue all necessary steps.

---

[16] At the hearing, Mr. Skolnick was uncertain whether Ms. Wainer and the children needed to be physically present in Singapore in order to obtain their residence visas or if they could receive the visas before their departure (Hr'g Tr. Vol. II [Doc. # 140] at 263), and neither party has since confirmed the procedure for obtaining residence visas in Singapore.  Even if Ms. Wainer and the children do not receive their residence visas before their return, they can initially enter Singapore as tourists without any prior approval.  (*Id.* at 264.)  Until the divorce is finalized, Ms. Wainer is eligible for the same dependence pass as the children and, after the divorce, she may obtain a parental visa available to those whose children attend school in Singapore.  (*Id.* at 265.)  Ms. Wainer testified that she believed that she would be required to leave Singapore once the divorce was finalized and she was no longer Mr. Skolnick's dependent, and was not aware of the option to obtain a parental visa.  (Hr'g Tr. Vol. III [Doc. # 141] at 428.)

5.      *Family Violence*

Ms. Wainer seeks an undertaking that Petitioner shall commit no acts of violence against the five children, including flicking, slapping, spanking, pushing, or hitting. (Resp't's Post-Hr'g Mem. at 16.)   The record regarding Petitioner's use of physical chastisement warrants the imposition of such an order consistent with the London and Singaporean Court's orders that Ms. Wainer says she wants enforced.[17]   Mr. Skolnick is restrained from committing any acts of violence against the children and Ms. Wainer, including flicking, slapping, spanking, pushing, or hitting.   This order will expire upon action by the Singaporean Court addressing this issue.

6.      *Health Insurance*

Respondent seeks an undertaking that Petitioner continue to pay for family health insurance for her and the children until the London or Singaporean Courts order otherwise.   (Resp't's Post-Hr'g Mem. at 16.)   Petitioner testified that upon the children's return to Singapore, his employer-provided health insurance will cover the children. Consistent with this representation, Mr. Skolnick is ordered to ensure that the children will be covered by health insurance immediately upon their return to Singapore.   He shall

---

[17] The Singaporean protective orders define "Family Violence" as "the commission of any sort of the following acts:"

> (a) Willfully or knowingly placing or attempting to place a family member in fear of hurt; (b) Causing hurt to a family member by such act which is known or ought to have been known would result in hurt; (c) Wrongfully confining or restraining a family member against his/her will; (d) Causing continual harassment with intent to cause or knowing that is likely to cause anguish to a family member; But does not include any force lawfully used in self-defense, or by way of correction towards a child below 21 years of age.

(Resp't's Ex. CC at 165, 176.)

also provide for Ms. Wainer's coverage until and unless the London or Singaporean Courts order otherwise.[18]

> 7.    *Care for E.S.*

There was substantial testimony and dispute at the hearing regarding the special needs of E.S.   Ms. Wainer requests that Petitioner pay for a neuropsychological assessment to be conducted on E.S. in the United States and "that the parties abide by any recommendations for treatment, therapy, medications or further testing made by the neuropsychologist and provide the recommended treatment, therapies, medications, and testing to E.S. in Singapore."   (Resp't's Post-Hr'g Mem. at 14; *see also* Resp't's Revised Mot. at 9.)   At the hearing, Petitioner expressed concern about continuity of care and having E.S.'s assessments conducted in the United States when treatment would be provided in Singapore.   Mr. Skolnick testified that he did not object to having a neurological assessment for E.S. or any other tests that are medically necessary and agreed that he would cover necessary medical expenses not covered by insurance (Hr'g Tr. Vol II at 259–62), but wanted to speak with E.S.'s doctors to ensure that such tests are required given that E.S. had a cranial M.R.I. without abnormal findings just two years ago in London.

Consistent with the State Department's guidance that undertakings addressing child care in great detail are not appropriate, *see Danaipour*, 286 F.3d at 22, the Court concludes that E.S.'s future treatment needs once he returns to Singapore must be left for the Singaporean Court, which will have greater familiarity than this Court with the medical resources available for E.S. in Singapore.   Although E.S. clearly has pressing

---

[18] As Petitioner and Respondent are still married, presumably Mr. Skolnick's employer-provided insurance will cover Ms. Wainer until their divorce.

needs and Dr. Klein testified that time is of the essence for performing a neurological assessment and starting treatment, there is no indication that a delay of two months will significantly impair treatment efficacy.  While Respondent understandably wants timely care for E.S., it is beyond the scope of this Court's mandate under the Convention to address such issues in the absence of a showing of imminent harm.[19]

### 8.   *Breach*

In the event that Petitioner breaches any of the undertakings, Ms. Wainer wants to return to the United States with the children and have Petitioner pay US$10,000 for their return airfare.  (Resp't Post-Hr'g Mem. at 16.)  Respondent characterizes this request as giving her the unilateral right to determine whether a breach has occurred, without judicial intervention and to return to the United States upon even a non-material breach.  (*See* Pet'r's Post-Hr'g Reply at 4–5.)

According to Petitioner, the Court's undertakings can be enforced by the Singaporean Court in case of a breach if this Order is "registered" with the court by either party.  (Pet'r's Post-Hr'g Mem. at 3.)  Much of this Order requires compliance from the parties before the children leave for Singapore, and the undertakings are intended to provide for the children's wellbeing for a very narrow time period.  Given the Court's limited mandate under the Convention, it will not prescribe any particular set of circumstances under which the children may return to the United States once they arrive in Singapore.[20]  Accordingly, Respondent's request for this undertaking is denied.  If there

---

[19] Nothing in this order precludes either party from pursuing appropriate treatment or testing for E.S. in the United States or Singapore until the Singaporean Court addresses this issue.

[20] Respondent cites *Ying v. Kerssengischer*, Case No. CA 65/2013 (Jan. 15, 2014) in which the Singapore Court of Appeals ordered a wife and child to return to Germany and

is a breach of any of these undertakings, Respondent can seek relief from this Court or the Singaporean or London Courts as appropriate.   If there are any breaches of these undertakings before the children leave, the Court will take appropriate action.

9.    *Singaporean Court*

Respondent requests that this Court explicitly state that nothing in this Order shall prevent Ms. Wainer from applying to the Singaporean Court to relocate with the children to the United States or elsewhere and that there has been no finding on the merits that Singapore is the country of habitual residence or wrongful removal.  (Resp't's Post-Hr'g Mem. at 17.)  As should be clear from the parties' Return Stipulation and the Court's authority under the Convention, Respondent is free to seek any custody orders that are available under Singaporean law and, pursuant to the Return Stipulation, the Court does not address the issue of habitual residence or wrongful removal.  The issue of final custody has been left to the Singaporean Court.

---

imposed an undertaking that if the husband breached any of the undertakings or the wife was unable to remain in Germany under German law, the husband had to consent to an application for her return to Singapore with the child.  (Resp't's Post-Hr'g Mem. at 16.) The Court does not consider such an undertaking to be consistent with the U.S. Department of State's guidance.

**III.    Conclusion**

For the reasons discussed above, the foregoing undertakings are ordered. Respondent's Motion [Doc. # 69] for Relief Under 42 U.S.C. § 11604 is DENIED as moot, Respondent's Motion [Doc. # 91] for an Order is DENIED, and Respondent's Revised Motion [Doc. # 112] for Relief is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 16th day of April, 2014.